IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CLINTON WALTON,

      Plaintiff,

v.                           CIVIL ACTION NO. 1:16CV141
                                    (Judge Keeley)

BAKER HUGHES OILFIELD
OPERATIONS, INC.,

      Defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]

The plaintiff, Clinton Walton ("Walton"), suffered a serious eye injury on July 1, 2014, while performing routine equipment maintenance at the direction of his employer, the defendant Baker Hughes Oil Field Operations, Inc. ("Baker Hughes"). For the reasons that follow, the Court **DENIES** three pending motions in this deliberate intention case, including the defendant's motion for summary judgment (Dkt. Nos. 53; 55; 59).

## I. BACKGROUND

### A.    Factual Background

As this is a dispositive motion filed by the defendant, Baker Hughes, the Court reviews the evidence in the light most favorable to Walton, the non-moving party. See Providence Square Assocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000).

On October 1, 2011, Baker Hughes, which provides oil and gas extraction services, hired Walton to work as an equipment operator

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]**

(Dkt. No. 1 at 1-2). Walton's responsibilities included operating equipment that Baker Hughes used to pump water and sand into oil and gas wells. On occasion, the pressure pumping equipment would become "jacked" and cease to function properly. When this occurred, Walton and other operators were tasked with rebuilding the offending pump, which included the removal of several "discharge valve caps," otherwise referred to as "suction caps" (Dkt. Nos. 53-3 at 4-6; 53-4 at 4; 53-14 at 2). The caps are recessed in approximately 8-inch openings on top of the pumps (Dkt. No. 53-14 at 3).

## 1.    The Task of Removal

Removal of the suction caps was a relatively routine task, one Walton had performed at least 100 times between 2011 and 2014 (Dkt. No. 53-3 at 6). Nonetheless, Walton testified that he had never received any formal training about how to perform the task, but rather learned on the job how to remove the discharge caps. Id. at 8.[1] Other employees testified that they had been shown how to remove suction caps at the start of their employment, and still

_____

[1] It is undisputed that, during the course of Walton's employment, he did receive documented training in various other areas, including personal protective equipment, stop work awareness, pressure pumping equipment, hand tool safety awareness, and hazard identification awareness (Dkt. No. 53-16).

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]**

others testified that training was "learn as you go" (Dkt. No. 56-8 at 2).

The method by which Baker Hughes trained its employees to remove suction caps - which some employees referred to as the correct, accepted, or approved method - involved the use of a slide hammer (Dkt. Nos. 53-5 at 4; 53-6 at 5-6; 53-7 at 6; 53-8 at 7, 14; 53-9 at 5). Slide hammers are tools that thread into the caps themselves, and as the name implies, employees use them to apply an upward force by sliding a weight up a "big metal dowel rod" into a fixed plate (Dkt. No. 53-3 at 7; 56-10 at 2).

At times, the threading of the slide hammer or suction cap would become damaged to such an extent that the tool would not function properly (Dkt. No. 56-3 at 2-3). Whenever a slide hammer was ineffective, employees would temporarily use an alternate, unapproved method of removal until a properly functioning slide hammer became available (Dkt. No. 53-4 at 9). This alternate method generally involved threading a large eye bolt into the suction cap, placing the end of a bar through the eye bolt, and using the bar to apply leverage to the suction cap (the so-called "eye-bolt method") (Dkt. No. 53-5 at 8). Aside from these common elements, however,

the particular aspects of the unapproved eye-bolt method varied from employee to employee.

There were, for example, several different bars that could be used, a "packing nut bar" being approximately two feet long, and a "line bar," which was between three and four feet long (Dkt. Nos. 53-6 at 12; 53-4 at 7; 53-8 at 15). Although Walton's coworkers differed about the frequency with which they used the short and long bars, they agreed they had seen supervisors using both of them (Dkt. Nos. 53-4 at 8; 53-5 at 10; 53-6 at 9; 53-13 at 4; 56-5 at 2).

It is undisputed that, while utilizing the eye-bolt method, operators occasionally would tap the eye bolt with a sledge hammer "trying to break that seal and cock the suction cap sideways so it [would] pop up out" (Dkt. No. 53-6 at 7, 11). Employees, however, differed as to whether one should ever strike the bar itself, rather than the eye bolt (Dkt. Nos. 53-5 at 8; 53-13 at 7; 56-4 at 2; 56-8 at 2).

Although Baker Hughes never instructed equipment operators to utilize the eye-bolt method (Dkt. Nos. 53-5 at 12; 53-7 at 8) – and one employee described it as "a shortcut we're not supposed to use"

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]**

(Dkt. No. 53-8 at 5)[2] – use of the method was commonplace (Dkt. No. 56-10 at 2; 53-15 at 5). Walton and another employee testified that managers or supervisors were aware of this practice and even had used the method themselves (Dkt. Nos. 53-8 at 6; 56-9 at 2).

**2.   Walton's Injury**

On July 1, 2014, the date of his injury, Walton was assigned to work on the Baker Hughes Hess Archer site in Cadiz, Ohio. There he participated in a "pre-job safety and operations meeting" at which field supervisor James Dotson ensured that all employees had their personal protective equipment ("PPE") (Dkt. Nos. 53-12 at 3; 53-21). That day's job safety analysis ("JSA") worksheet also indicates that the crew discussed safe practice when using a hammer (Dkt. No. 53-22 at 3). Neither the meeting nor the JSA specifically addressed rebuilding fluid end pumps or removing discharge caps.

Nevertheless, during the shift, Walton's supervisor directed him to rebuild a fluid end pump (Dkt. No. 1 at 2). While working on the pump, Walton attempted to remove one particular discharge cap

---

[2]   Indeed, Baker Hughes management employee James Paugh testified that the alternate method should not have been used. If an employee could not remove a suction cap with a slide hammer, a mechanic, rather than the equipment operator himself, should address the issue (Dkt. No. 53-11 at 5). Management employee Anthony Jones also testified that employees were trained to stop working if a slide hammer became inoperable (Dkt. No. 53-9 at 5).

MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]

using the slide hammer that was on-site (Dkt. No. 53-3 at 9). When the slide hammer method failed, however, Walton resorted to a version of the eye-bolt method. Placing an eye bolt into the suction cap, he slid a short bar through the eye bolt and attempted to strike the bar with a sledge hammer. Instead, the sledge hammer struck another bar laying nearby, which in turn struck Walton in the right eye (Dkt. No. 53-3 at 10-14).[3] Although he was quickly transported to the hospital following his injury, Walton ultimately lost the use of his right eye.

Baker Hughes immediately shut down the Hess Archer site for several days to investigate Walton's injury (Dkt. No. 53-4 at 6). It ultimately concluded that Walton had used the wrong tool, in part because he had incorrectly assumed that the "commonly used" eye-bolt method was an accepted practice (Dkt. Nos. 53-14 at 4; 56-1 at 3). As a result, Baker Hughes determined that Walton had not followed the standard operating procedure ("SOP") for suction cap removal, and that the procedure was not clear to employees.[4]

_____

[3] Walton initially reported that the bar he was using slid out of the eye bolt and struck him (Dkt. No. 56-6 at 1). Indeed, Baker Hughes held a safety meeting with employees where it so described the mechanism of Walton's injury (Dkt. No. 53-8 at 9).

[4] In June 2014, Baker Hughes implemented a revised SOP regarding suction cap removal, which included the use of a new tool

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]**

Moreover, Walton's supervisor had not conducted a JSA for the task in question (Dkt. No. 53-14 at 4).

**B.     Procedural Background**

On June 28, 2016, Walton sued Baker Hughes under West Virginia's deliberate intent statute, W. Va. Code § 23-4-(d)(2)(ii). He alleged that Baker Hughes had failed to train him on or provide him with the proper equipment, thereby resulting in his use of an unapproved, alternate method of discharge cap removal, which resulted in his injury (Dkt. No. 1). Pending before the Court is Baker Hughes's motion for summary judgment on Walton's sole claim for recovery pursuant to W. Va. Code § 23-4-2(d)(2)(ii) (2014). Also pending are two related motions to strike filed by Walton.

**II. DISCUSSION**

**A.     Motions to Strike**

Approximately one week after Baker Hughes filed its motion for summary judgment, it filed a supporting affidavit of safety

---

called a "cover removal tool" or "cap puller" (Dkt. No. 53-9 at 4-5). The revised SOP had not been reviewed with Walton prior to his injury, but even had Walton been provided the revised SOP, the cap pullers were on backorder and unavailable until September 2014 (Dkt. No. 53-20). The use of slide hammers remains an accepted method of removing discharge caps (Dkt. No. 53-10 at 5-6).

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]**

specialist Michael Kuhn ("Kuhn"), which it apparently had failed to
procure before Kuhn left on vacation (Dkt. No. 53-1 at 4 n.2).
Walton moved to strike this affidavit based on purported
inconsistencies between it and Kuhn's deposition testimony (Dkt.
No. 55). When Baker Hughes responded to Walton's motion outside the
14-day period provided by the rules (Dkt. No. 58), Walton moved to
strike the untimely response brief (Dkt. No. 59).

1.    **Motion to Strike Response Brief**

Although Walton recognizes "that only one day passed after the
filing deadline," he argues that Baker Hughes cannot provide a
sufficient reason to justify its late filing. Id. at 4-7. In
response, Baker Hughes concedes that it "was one day late because
it was simultaneously working on" summary judgment briefing. It
nonetheless argues that Walton will not be prejudiced by the late
filing, and asks the Court to allow the submission of its response
brief (Dkt. No. 63 at 2-3). In his reply, Walton insists that Baker
Hughes's busy schedule is an insufficient basis to justify any
extension (Dkt. No. 64 at 2).

Fed. R. Civ. P. 6(b) gives the Court discretion to extend a
deadline after its passage upon a showing of "excusable neglect."

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]**

The Court thus construes Baker Hughes's argument as a motion to permit its late filing based on excusable neglect.

> Under the law of the United States Court of Appeals of the Fourth Circuit, " '[e]xcusable neglect' is not easily demonstrated, nor was it intended to be . . . 'the burden of demonstrating excusability lies with the party seeking the extension and a mere concession of palpable oversight or administrative failure generally has been held to fall short of the necessary showing . . .'" Thompson v. E.I. DuPont de Nemours & Co., 76 F.3d 530, 534 (4th Cir.1995) (quoting In re O.P.M. Leasing Serv., Inc., 769 F.2d 911, 917 (2d Cir. 1985)). . . .
>
> . . .
>
> . . . The elements for consideration are: (1) "the danger of prejudice to [the non-moving party]," (2) "the length of the delay and its potential impact on judicial proceedings," (3) "the reason for the delay, including whether it was in the reasonable control of the movant, and" (4) "whether the movant acted in good faith." Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). Quite obviously, the most important of these factors in deciding whether the "neglect" was "excusable" is the proffered reason for it. Thompson, 76 F.3d at 534.

Anderson v. Spencer, No. 5:09CV117, 2011 WL 6748827, at *2–*3 (N.D.W. Va. Dec. 21, 2011); see also Martinez v. United States, 578 F. App'x 192, 194 n.* (4th Cir. 2014) (unpublished decision).

Baker Hughes's admission that it merely overlooked the deadline weighs against a finding of excusable neglect. Thompson, 76 F.3d at 533 ("[A] mere concession of palpable oversight or

administrative failure generally has been held to fall short of the necessary showing."). Nonetheless, the remaining three factors from Pioneer favor extending the deadline.

First, although Walton argues that he is prejudiced by the late-filed response, he provides no basis for this argument other than the possibility that the Court will heed its contentions (Dkt. No. 60 at 4-5). Were this alone sufficient, every late-filed brief would result in prejudice and consideration of the factor would be futile. Second, the delay of one day is as brief as possible. Finally, Walton simply does not allege that Baker Hughes acted in bad faith, and even acknowledges that he "is sympathetic to Baker Hughes' busy schedule" that resulted in the late filing (Dkt. No. 64 at 2). Based on this, the Court finds that Baker Hughes has proffered a reasonable excuse for its late filing and therefore **DENIES** Walton's motion to strike (Dkt. No. 59).

### 2.    Motion to Strike Kuhn's Affidavit

Walton also has moved to strike the affidavit of safety specialist Kuhn, arguing that it is impermissibly inconsistent with Kuhn's sworn deposition testimony (Dkt. No. 55).

Although Fed. R. Civ. P. 56(b)(4) allows parties to support their motions for summary judgment with supporting affidavits, the

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]**

Court may impose appropriate sanctions if such an affidavit "is submitted in bad faith or solely for delay." Fed. R. Civ. P. 56(h). As Walton contends, an affidavit in support of summary judgment may have been submitted in bad faith if it contradicts the affiant's prior sworn testimony. <u>See, e.g.</u>, <u>Turner v. Baylor Richardson Med. Ctr.</u>, 476 F.3d 337, 349 (5th Cir. 2007) (citing <u>Modica v. United States</u>, 518 F.2d 374, 376 (5th Cir. 1975)) (reasoning that direct conflict between declarations and prior deposition testimony may indicate bad faith); <u>Fort Hill Builders, Inc. v. Nat'l Grange Mut. Ins. Co.</u>, 866 F.2d 11, 16 (1st Cir. 1989) (citing <u>Barticheck v. Fidelity Union Bank/First Nat'l State</u>, 680 F. Supp. 144 (D.N.J. 1988); <u>Acrotube, Inc. v. J.K. Fin. Grp., Inc.</u>, 653 F. Supp. 470, 478 (N.D. Ga. 1987)). Nonetheless, the Court cannot discern any egregious inconsistency between Kuhn's testimony and his affidavit that warrants a finding of bad faith.

In his deposition, Kuhn agreed with opposing counsel that, in its investigation of Walton's injury, Baker Hughes had uncovered serious safety shortcomings in its workplace. For instance, he agreed that Baker Hughes had not conducted required risk and job assessments, and further had failed to provide work stands, adequate space, standard operating procedures, or appropriate tools

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]**

(Dkt. No. 56-1 at 8). Kuhn testified that he understood the "mechanism of [Walton's] injury" to have been the pry bar coming out of the eye bolt and striking him. Id. at 9. But he further agreed that, "[r]egardless of how [Walton] was hurt – whether he hits that bar and that bar flies up and hits him; whether he hits that bar and the hammer bounces back and hits him . . . whether he hits that bar and there's extraneous materials laying there and one of that flies up and hits him," the findings of his investigation would have remained unchanged. Id.[5]

Kuhn's affidavit clarifies that, during the investigation, he "understood Mr. Walton's injury was the result of him striking the pry bar he placed into the eye bolt and that particular pry bar dislodging and striking Mr. Walton in the face" (Dkt. No. 54 at 1). "[T]he investigation and subsequent reports were based upon" this understanding of the accident, rather than the fact that Walton "was injured as a result of a second pry bar being struck by him." Id. at 2. Indeed, a review of the Baker Hughes "incident review" and related corporate documents makes clear the company's

---

[5] Although Baker Hughes points out that it objected to the form in which Walton's counsel posed these questions (Dkt. No. 58 at 4), it has not argued that the facts "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]**

impression that "the bar came out of the eye bolt and into [Walton's] eye" (Dkt. Nos. 53-14 at 2; 53-20; 56-6).

Walton objects that Kuhn's affidavit "attempts to rid defendant of liability" by clarifying that the Baker Hughes investigation and reports were premised on a "misunderstanding" of how Walton's injury occurred (Dkt. No. 55 at 2). In reality, however, Kuhn's affidavit does not disclaim any of his prior testimony or call into question his admission that the mechanism of injury would have no effect on the findings in Baker Hughes's report. Rather, it merely reinforces what is already clear from Kuhn's deposition and the defendant's documentation, that is, until contrary information surfaced during Walton's deposition, Baker Hughes was unaware that an "extraneous" bar was to blame for Walton's injuries. Therefore, because this clarification is not an inconsistency submitted in bad faith, the Court **DENIES** Walton's motion to strike Kuhn's affidavit (Dkt. No. 55).

**B.    Motion for Summary Judgment**

**1.    Standard of Review**

Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory

answers, or other materials" establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A). When ruling on a motion for summary judgment, the Court reviews all the evidence "in the light most favorable" to the nonmoving party. Providence Square, 211 F.3d at 850. The Court must avoid weighing the evidence or determining its truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has made the necessary showing, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256 (internal quotation marks and citation omitted). The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment; the evidence must be such that a rational trier of fact could reasonably find for the nonmoving party. Id. at 248-52.

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]**

## 2.    Applicable Law

The West Virginia Worker's Compensation Act typically provides employers with immunity from suit when an employee is injured on the job. W. Va. Code § 23-4-2(d)(1) (2014). The employer can lose that immunity, however, if an employee proves that the employer acted with "deliberate intention." Id. § 23-4-2(d)(2). At the time of Walton's injury, see McComas v. ACF Industries, LLC, 750 S.E.2d 235, 238 & n.4 (W. Va. 2013), the controlling statute provided that a plaintiff could establish "deliberate intention" by proving:

> (A) That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;
>
> (B) That the employer, prior to the injury, had actual knowledge of the existence of the specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition;
>
> (C) That the specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of the employer, as demonstrated by competent evidence of written standards or guidelines which reflect a consensus safety standard in the industry or business, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions;

15

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]**

(D) That notwithstanding the existence of the facts set forth in subparagraphs (A) through (C), inclusive, of this paragraph, the employer nevertheless intentionally thereafter exposed an employee to the specific unsafe working condition; and

(E) That the employee exposed suffered serious compensable injury or compensable death as defined in section one, article four, chapter twenty-three whether a claim for benefits under this chapter is filed or not as a direct and proximate result of the specific unsafe working condition.

W. Va. Code § 23-4-2(d)(2)(ii)(A)-(E) (2014).[6] To survive a motion for summary judgment, the plaintiff "must offer evidence to prove each of the five specific statutory requirements." McComas, 750 S.E.2d at 240 (quoting Syl. Pt. 2, Helmick v. Potomac Edison Co., 406 S.E.2d 700 (W. Va. 1991)).

3.    **Legal Analysis**

Baker Hughes argues that it is entitled to summary judgment because Walton cannot establish the requirements of subparagraphs (B) and (C) of W. Va. Code § 23-4-2(d)(2)(ii) (Dkt. No. 53-1). After careful review, the Court concludes that Walton has

---

[6] Deliberate intention may also be established by proof that an employer "acted with a consciously, subjectively and deliberately formed intention to produce the specific result of injury or death to an employee," W. Va. Code § 23-4-2(d)(2)(i) (2014), but Walton did not plead this theory of liability.

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING**
**PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]**

established the existence of disputed material facts sufficient to avoid summary judgment.

**a.  Unsafe Working Condition**

The foundation of Walton's deliberate intent claim is the existence of "a specific unsafe working condition . . . which presented a high degree of risk and a strong probability of serious injury or death." W. Va. Code § 23-4-2(d)(2)(ii)(A) (2014). Although Baker Hughes does not appear to contest that such a condition existed on the Hess Archer site, the Court must "identify the specific unsafe working condition" before analyzing the challenged elements. Bevins v. Apogee Coal Co., LLC, No. 2:13cv24264, 2014 WL 7236415, at *3 (S.D.W.Va. Dec. 17, 2014); see also Deskins v. S.W. Jack Drilling Co., 600 S.E.2d 237, 241 (W. Va. 2004). "[S]ubsection (A) requires more than a showing that an unsafe working condition could produce an injury. The unsafe working condition must present a high degree of risk and strong probability of serious injury or death." Baisden v. Alpha & Omega Coal Co., LLC, No. 2:11-079, 2012 WL 259949, *8 (S.D.W.Va. Jan. 27, 2012) (emphases added). Given that Walton bears the burden at this stage to establish each element, Anderson v. Liberty Lobby, 477 U.S. at 256; McComas, 750 S.E.2d at 240, the Court defers to his

17

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]**

description of the allegedly unsafe condition. <u>Bevins</u>, 2014 WL
7236415, at *3–*4.

There is, however, one aspect of Walton's allegations that the
Court will not consider in its analysis. During argument on the
motion for summary judgment, Walton maintained that Baker Hughes
failed to provide him the "appropriate equipment" or "safest" tool
with which to remove the discharge caps. More specifically, he
contended that Baker Hughes should have provided him with the June
2014 revised SOP, as well as the new cap puller tool, which was on
back order at the time (Dkt. Nos. 53-18 at 6; 53-19 at 4).

Walton does not, however, contest that Baker Hughes provided
him with a slide hammer, on which he had received on-the-job
training ("OJT"), and which remained an accepted method of suction
cap removal at the time he was injured. The gravamen of Walton's
case therefore is not that Baker Hughes failed to provide <u>any</u> safe
tool with which to remove discharge caps, but that he was not
properly trained on what to do when the slide-hammer method became
unavailable.[7]

---

[7] As discussed during the hearing on the defendant's motion
for summary judgment on October 31, 2017, it is unclear whether
this theory of the case advances Walton's cause. Providing one safe
tool rather than another simply cannot support a finding of
deliberate intention.

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]**

This contention aside, Walton's definition of the allegedly unsafe working condition remains rather oblique; nevertheless, the Court has been able to distill two primary contentions from the record and oral argument. First, Walton contends that Baker Hughes employees' widespread use of the unapproved eye-bolt method itself presented an unsafe working condition (Dkt. No. 56 at 6). To that end, a Baker Hughes supervisor agreed that engaging in "metal-on-metal striking" presented a risk of injury from "flying particles or flying debris" (Dkt. No. 56-10 at 2).

Second, and perhaps more on point, Walton's safety expert opined that Baker Hughes had created an unsafe working condition by failing to conduct a JSA and develop appropriate training for the task in question (Dkt. Nos. 53-18 at 6; 56 at 6-8). Indeed, the failure to provide training required by regulation or industry standard can, alone, be an unsafe working condition. See Skaggs v. Kroger Co./Kroger Ltd. Partnership I, 788 F. Supp. 2d 501 (S.D.W.Va. 2011) (citing Arnazzi v. Quad/Graphics, Inc., 621 S.E.2d 705 (2005)). Walton's safety expert opined that this lack of proper training "presented a high degree of risk and strong probability of serious injury or death" (Dkt. No. 53-18 at 6).

MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]

### b.   Violation of Regulation or Standard

Baker Hughes argues that each of the regulations and standards identified by Walton are too general to satisfy subparagraph (C) of W. Va. Code § 23-4-2(d)(2)(ii) (2014) (Dkt. No. 53-1 at 15). It is appropriate to address this threshold issue prior to assessing whether Baker Hughes had "actual knowledge" pursuant to subparagraph (B). See McComas, 750 S.E.2d at 240. To satisfy subparagraph (C), Walton must offer a regulation or safety standard that "prescribes specifically identified duties, as opposed to merely expressing a generalized goal of safety." Ryan, 639 S.E.2d at 763. He thus must establish "that the specific unsafe working condition was a violation of a safety regulation or safety standard specifically applicable to the particular work and working conditions involved (as contrasted with a regulation or standard generally requiring safety in the workplace)." McComas, 750 S.E.2d at 240 (emphases in original). "For example, a regulation directed specifically to coal mining could not be used as a basis for establishing a violation by an employer operating exclusively in the lumber industry, while a regulation falling under a more general classification, such as labor, might be applicable to several different industries." Ryan, 639 S.E.2d at 764.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]

Through his experts, Walton has proffered that Baker Hughes violated the following regulations and safety standards: 29 C.F.R. § 1910.132(d)(1), (d)(2), and (f)(1); 29 C.F.R. § 1910.242(a); and American National Standards Institute, American Society of Safety Engineers ("ANSI/ASSE") Z490.1-2009; and American Petroleum Institute ("API") Recommended Practice ("RP") 54 (Dkt. Nos. 53-1 at 11; 56 at 18-23). To analyze these provisions, the Court must define more particularly the scope of Walton's alleged unsafe working condition. None of the safety provisions Walton has asserted has any specific bearing on the method he used to remove a discharge cap. Therefore, the relevant question with regard to subparagraph (C) is whether his use of the unapproved eye-bolt method was due to Baker Hughes's failure to conduct appropriate workplace assessments and provide mandated training. Within this framework, the Court will consider each of the regulations and standards Walton has identified.

### i.   Regulations

Walton's safety experts cite both 20 C.F.R. § 1910.132 and § 1910.242 in support of their opinions, but Baker Hughes contends each of these regulations is "not specific enough to establish deliberate intent" (Dkt. No. 53-1 at 15). The Court agrees that

MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]

neither provision satisfies the requirements of subparagraph (C) in this case.

First, 29 C.F.R. § 1910.132 relates to "General Requirements" for PPE. Among other things, the regulation requires an employer to assess the workplace for hazards that require the use of PPE, verify in a written certification that the evaluation has been performed, and provide PPE training to affected employees. Id. § 1910.132(d)(1), (d)(2), (f)(1). Contrary to Baker Hughes's argument that this regulation is not specific enough to satisfy subparagraph (C), West Virginia law expressly holds that § 1910.132 "imposes a specific mandatory duty upon employers in the labor industry to assess their workplaces for the purpose of identifying hazards, assessing the need for protective equipment, and, where a need is identified, requiring employees to use the requisite safety equipment." Ryan, 639 S.E.2d at 763.

Nonetheless, it is undisputed that Walton did receive training on PPE, and that, on July 1, 2014, his shift included a JSA and pre-job meeting that addressed appropriate PPE for the workplace and ensured that all personnel were wearing the protective gear (Dkt. Nos. 53-16; 53-17; 53-21). Critically, Walton has failed to indicate that Baker Hughes should have required further PPE or that

"the lack of personal protective equipment played [any] role in the accident." <u>Redman v. Federal Grp., Inc.</u>, No. 13-0377, 2013 WL 6153158, at *4 (W. Va. 2013) (memorandum decision). Therefore, even though § 1910.132 is specifically applicable to the work in question, Walton has not offered any evidence of its violation.[8]

Next, Walton's experts point to 29 C.F.R. § 1910.242(a), which states generally that "[e]ach employer shall be responsible for the safe condition of tools and equipment used by employees." On its face, this regulation only "generally require[s] safe . . . equipment." W. Va. Code 29 § 23-4-2(d)(2)(ii)(C) (2014). Therefore, even assuming that Baker Hughes violated its duty to keep tools and equipment in a safe condition, that violation cannot satisfy the specificity required by subparagraph (C). <u>See</u> <u>Bevins</u>, No. 2:13-cv-24264, 2014 WL 7236415, at *5-*8 (reasoning that a regulation requiring correction of unsafe equipment defects did not satisfy subparagraph (C)).

---

[8] Moreover, although Baker Hughes's employees testified generally that Walton's supervisor violated regulations and standards by failing to conduct a JSA on fluid end pump maintenance on the date of Walton's injury (Dkt. No. 56 at 11-15), Walton has not actually pointed to a provision other than § 1910.132 that arguably would require such a specific assessment.

MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]

### ii. Industry Standards

Walton also purports to rely on several industry standards, including ANSI/ASSE Z490.1-2009 and API RP 54. The parties do not dispute that these standards are "commonly accepted and well-known . . . within the industry" in that they are "written standards or guidelines which reflect a consensus safety standard in the industry." W. Va. Code § 23-4-2(d)(2)(ii)(C). Baker Hughes, however, argues that these standards merely establish "the minimum requirements a training program must include," and that Walton has not detailed how Baker Hughes's training programs fall short (Dkt. No. 53-1 at 16). Walton, on the other hand, contends that these standards required Baker Hughes to perform certain assessments and inspections (Dkt. No. 53-18 at 7; 56 at 18-19).

ANSI/ASSE Z490.1-2009 requires employers to assess the need for training and to develop training that specifies "[d]elivery method(s) appropriate to the target audience and stated learning objectives." The employer may use multiple delivery methods, including OJT, lectures, and discussions. ANSI/ASSE Z490.1-2009 §§ 4.4.1, E4.4.1. Under this standard, OJT "must be properly documented" with "date, attendees' names, and training topics." Id.

MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]

§ C.3a.[9] Likewise, API RP 54 addresses safety for oil and gas well drilling and servicing. With regard to operations, the standard states that "[p]ersonnel should receive instruction in correct work methods to reduce chance of injury to themselves or fellow personnel." API RP 54 § 6.1.6. The employer should also establish and maintain a safety program that instructs "crew members on work procedures and safe practices" and includes meetings "in which the probable hazards, problems of the job and related safe practices are emphasized and discussed." Id. § 6.1.7.

According to Walton's expert, Baker Hughes could not have assessed the need for training without at some point conducting a hazard risk assessment ("HRA") or JSA regarding the task in question (Dkt. No. 53-18 at 7). Although Baker Hughes argues that it conducted a safety meeting and JSA on the date in question, there is no evidence of whether it assessed the need for training on fluid end pumps, including suction cap removal, and developed an appropriate program as required by industry standards. The widespread use of the eye-bolt method, on which Baker Hughes never

---

[9] To the extent that Walton claims Baker Hughes violated this standard by failing to document his OJT properly, the question remains whether such a violation was the proximate cause of his injury.

trained its employees, leads to the reasonable inference that Baker
Hughes never provided such appropriate training. And, as alleged by
Walton, it was such lack of training that led him to use the
unapproved eye-bolt method. As a result, Walton has established
that there are material facts in dispute regarding whether he was
provided with industry-mandated training, including the appropriate
course of action to follow when the accepted slide-hammer method
became unavailable.

### c.   Actual Knowledge

Under subparagraph (B), Walton bears the burden of proving
that, "prior to [his] injury," Baker Hughes "had actual knowledge
of the existence of [a] specific unsafe working condition <u>and</u> of
the high degree of risk and the strong probability of serious
injury or death presented by the specific unsafe working
condition." W. Va. Code § 23-4-2(d)(2)(ii)(B) (2014) (emphasis
added). "This requirement is not satisfied merely by evidence that
the employer reasonably should have known . . . . Instead, it must
be shown that the employer actually possessed such knowledge." Syl.
Pt. 5, <u>Coleman Estate ex rel. Coleman v. R.M. Logging, Inc.</u>, 700
S.E.2d 168 (W. Va. 2010) (quoting Syl. Pt. 3, <u>Blevins v. Beckley
Magnetite, Inc.</u>, 408 S.E.2d 385 (W. Va. 1991)).

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]**

Actual knowledge is thus "a high threshold that cannot be successfully met by speculation or conjecture." Id. at 176. Nonetheless, the standard may be met by circumstantial evidence, and "evidence of prior similar incidents or complaints is not mandated." Skaggs v. Kroger Co./Kroger Ltd. Partnership I, 788 F. Supp. 2d 501, 507 (S.D.W.Va. 2011) (quoting Syl. Pt. 2, Nutter v. Owens-Illinois, Inc., 550 S.E.2d 398 (2001)). It is unclear why Baker Hughes contends that it lacked "actual knowledge," but Walton has pointed to abundant evidence in the record that it was aware of the allegedly unsafe conditions.

Direct evidence is, of course, the simplest method of proving actual knowledge. In Skaggs, a case relied on by Walton, grocery store employees were required to use motorized "pallet jacks," which had a history of malfunctioning. 788 F. Supp. 2d at 503. About four months into his employment, the plaintiff was injured when a pallet jack accelerated toward him and would not brake properly, thus rolling over his foot and fracturing multiple bones. Id. at 503-04. Denying the employer summary judgment in the plaintiff's deliberate intent lawsuit, the court reasoned that testimony regarding the night supervisor and store manager's

knowledge of the pallet jack's problems established the employer's actual knowledge of the unsafe working condition. Id. at 508.

Here, Baker Hughes had actual knowledge of the widespread use of the "unapproved" eye-bolt method by which Walton attempted to remove the discharge cap in question. Baker Hughs employees consistently testified that an alternate method of removing discharge caps was commonly utilized, and that field supervisors not only were aware of the practice but had even used it themselves. See supra Part I. Therefore, Walton has established that, like the employer in Skaggs, "supervisory-level employees" - and thus Baker Hughes - had actual knowledge of this aspect of the allegedly unsafe working condition.[10]

Further, there is sufficient evidence that Baker Hughes had knowledge of its alleged failure to provide appropriate training.

---

[10] Baker Hughes attempts to sidestep proof of its actual knowledge by arguing that it was unaware of the exact manner by which Walton attempted to remove the suction cap (Dkt. Nos. 53-1 at 10; 57 at 4-5). According to Baker Hughes, hitting the pry bar forcibly, rather than tapping the eye bolt or hitting the pry bar lightly, was not a common, alternate means of completing the task (Dkt. No. 53-1 at 10). Aside from blaming Walton's injury on "his lack of common sense when using a hammer" (Dkt. No. 57 at 5), Baker Hughes has failed to explain why any distinction in the "unapproved" methods used by its employees excuses its actual knowledge that these employees were not following approved protocols.

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]**

The Supreme Court of Appeals of West Virginia addressed a similar situation in <u>Arnazzi v. Quad/Graphics, Inc.</u>, where an employer assigned the inexperienced plaintiff to work as a forklift operator on the first day of his employment. In doing so, the employer acted contrary to an Occupational Health and Safety Administration ("OSHA") regulation that required specific training in numerous areas of forklift operation prior to certification of an employee for the task. 621 S.E.2d at 706 n.2. Despite having knowledge of this requirement, the employer did not appropriately train any of its forklift operators. The court observed that this failure to provide "legally-mandated training" amounted to an unsafe working condition. <u>Id.</u> at 706; <u>see also</u> <u>Skaggs</u>, 788 F. Supp. 2d at 506-07 (reasoning that employer created an unsafe working condition by failing to provide mandatory training on operating pallet jacks).

Here, Walton's safety expert has opined that, in order to develop and provide appropriate training as contemplated by industry standards, it would be "critical" for Baker Hughes to perform an HRA and JSA regarding suction cap removal (Dkt. No. 53-18 at 7). As discussed, there is no evidence in the record that Baker Hughes ever conducted such an assessment. Indeed, there is no evidence that Baker Hughes ever trained Walton how to remove

MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]

discharge caps other than the OJT Walton may have received from his coworkers (Dkt. No. 53-3 at 8-9). Walton has thus established a dispute of material fact regarding whether he was appropriately trained, and whether such training would have prevented him from attempting to remove the discharge caps in the manner that led to his serious injury.[11]

### III. CONCLUSION

For the reasons discussed, the Court:

1) **DENIES** Baker Hughes's Motion for Summary Judgment (Dkt. No. 53);

2) **DENIES** Walton's Motion to Strike the Affidavit of Michael Kuhn from Defendant's Motion for Summary Judgment (Dkt. No. 55); and

3) **DENIES** Walton's Motion to Strike the Defendant's Response in Opposition (Dkt. No. 59).

It is so **ORDERED.**

---

[11] The record is not sufficiently developed regarding whether the allegedly unsafe conditions "presented a high degree of risk and strong probability of serious injury or death," and Baker Hughes did not specifically address the issue in its motion. Therefore, the Court cannot determine what actual knowledge Baker Hughes had of any risk associated with the allegedly unsafe conditions.

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53] AND DENYING
PLAINTIFF'S MOTIONS TO STRIKE [DKT. NOS. 55; 59]**

The Court **DIRECTS** the Clerk to transmit copies of this Order

to counsel of record.

DATED: November 9, 2017.

                              /s/ Irene M. Keeley
                              IRENE M. KEELEY
                              UNITED STATES DISTRICT JUDGE